```
1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
2                        SOUTHERN DIVISION

   _____
3                                 )
   UNITED STATES OF AMERICA       )
4                                 )
        v.                        )  Case No. 8:19-cr-00121-PJM-1
5                                 )
   RICARDO CARTER II,             )
6                                 )
                     Defendant.   )
7  _____)

8                                  Greenbelt, Maryland
                                   December 9, 2021
9                                  2:35 p.m.

10                       SENTENCING HEARING
            BEFORE THE HONORABLE PETER J. MESSITTE
11
                     A P P E A R A N C E S
12
   On Behalf of the Government:
13

14      OFFICE OF THE FEDERAL PUBLIC DEFENDER
        100 S. Charles Street
15      Tower II, 9th Floor
        Baltimore, Maryland  21201
16      (410) 962-3962
        BY:  ELIZABETH GENEVIEVE OYER
17           ASSISTANT FEDERAL PUBLIC DEFENDER
          liz_oyer@fd.org
18
   On Behalf of the Defendant:
19

20      OFFICE OF THE UNITED STATES ATTORNEY
        6406 Ivy Lane, Suite 800
        Greenbelt, Maryland  20770
21      BY:  KELLY O'CONNELL HAYES, Assistant U.S. Attorney
             (301) 344-0041
22        kelly.hayes@usdoj.gov

23                     PATRICIA KLEPP, RMR
                       Official Court Reporter
24               6500 Cherrywood Lane, Suite 200
                   Greenbelt, Maryland  20770
25                       (301) 344-3228
```

1          P R O C E E D I N G S

2      (Call to order of the Court.)

3          THE COURTROOM DEPUTY:  May I have your attention.  The

4  United States District Court for the District of Maryland is now

5  in session, the Honorable Peter J. Messitte presiding.

6          MS. HAYES:  Good afternoon, Your Honor.

7          MS. OYER:  Good afternoon, Your Honor.

8          THE COURT:  All right.

9          THE COURTROOM DEPUTY:  The matter now pending before

10  the Court is Criminal Case No. PJM 19-0121, The United States of

11  America vs. Ricardo Carter II.  The matter now comes before the

12  Court for a sentencing.

13          THE COURT:  Have counsel identify yourselves for the

14  government and then defendant.

15          MS. HAYES:  Good afternoon, Your Honor.  Kelly Hayes

16  on behalf of the United States.

17          MS. OYER:  Good afternoon, Your Honor.  Liz Oyer for

18  Ricardo Carter, who is present to my left.

19          THE COURT:  All right.  Counsel, if you're both -- if

20  you're vaccinated, you can address the Court without your mask

21  on; a little easier to understand you with that.  Same as the

22  defendant.  Has he been vaccinated?

23          MS. OYER:  Yes, Your Honor.

24          THE COURT:  All right.

25          All right.  Well, then, with that in mind, unless

1    there's something preliminary, let's get right to it.

2          The first order of business, then, would be to make a

3    determination regarding the statement of reasons.  Hold on; I

4    don't know where that -- where that got to.  Still one paper I'm

5    sorry I'm not finding.  Statement of reasons should be on top.

6          All right, my problem.  All right.

7          There is a divergence between what Probation is

8    recommending in terms of acceptance of responsibility and what

9    both the government and the defendant are suggesting, which is a

10   three-level credit for acceptance of responsibility.  Probation

11   is suggesting that there be no acceptance of responsibility

12   given.

13         Here's the issue that I've got, and it's troublesome.

14   Clearly, this fellow, who is the defendant, went out and did

15   exactly the sort of thing that he was eventually pleading to.

16   Now, the curious thing is that he did all this before the

17   plea agreement was entered, but there's nothing in the

18   plea agreement that reflects the fact that between his arrest

19   and his plea, he went out and committed further inappropriate

20   acts, illegal acts, acts of the very same nature, and yet, I see

21   nothing reflected in the plea agreement that takes account of

22   that.  It's like's it's a free ride, from the time that he was

23   arrested, to go out and do the things he did.

24         Yes, he was revoked, yes, he served time since then,

25   but I assume the argument here is going to be, he should get

1  credit for time served in whatever sentence I give, since he's

2  been in custody for April.  So even that doesn't take into

3  account the illegal, inappropriate conduct that occurred before

4  April of 2021.

5          So I put it up to you, first, Ms. Hayes.  What are we

6  talking about here?  Why is there nothing that addresses what he

7  did before you go through those?

8          MS. HAYES:  Your Honor, if you're referring to his

9  con- --

10          THE COURT:  Well, can you take your mask down, if you

11  don't mind.

12          MS. HAYES:  Oh, excuse me, thanks.

13          Your Honor, if you're referring to the conduct after

14  he was released by pre -- or by Judge Simms and it was put on

15  pretrial services, he does receive a -- I believe it's two-level

16  bump for obstruction of justice, which is intended to be the

17  two-level -- that two-revel enhancement is related to that

18  conduct while on pretrial release that ultimately resulted in

19  the revocation of his pretrial release.

20          THE COURT:  Okay.  But it shouldn't affect his

21  acceptance of responsibility.  Doesn't it tend to show a lack of

22  remorse?

23          MS. HAYES:  Your Honor, the government stands by its

24  plea agreement for the three levels.  The government believes

25  that while tortured, in that there was a significant number of

1   delays in the rearraignment, which ultimately did not occur

2   until after, he did indicate very early on that he intended to

3   plead guilty.  There were multiple delays in actually scheduling

4   the re- -- or, sorry, in rescheduling repeatedly the

5   rearraignment, and then ultimately, a trial date was set in, and

6   then he was revoked and ended up pleading.

7          But from the very beginning, when another AUSA was

8   handling it, we were under the understanding such that we did

9   not have to continue the investigation as it relates to the

10  underlying conduct.  So the government does believe and does

11  intend to make the motion for the third level for acceptance of

12  responsibility.

13         And the conduct of Mr. Carter while on pretrial

14  release, of course, is reflected in the two-level enhancement

15  for obstruction of justice, and certainly, the government

16  contends, should be taken into account in terms of the 3553(a)

17  factors, which is why the government is seeking the high end of

18  the guidelines after a -- three levels of acceptance.

19         THE COURT:  Well, let's go to Paragraph 36 of the

20  agreement, make sure I understand what the content of the

21  two-level adjustment for obstruction of justice is.

22         It says that he willful obstructed understood, meaning

23  I'm not sure what at that point, but then two levels are added,

24  and all it says, he didn't surrender as he was supposed to.  No

25  reference in that Paragraph 36 to his misconduct.

```
 1              MS. HAYES:  Then -- correct, Your Honor.  And I do
 2    note, Your Honor, that the conduct while on pretrial release is
 3    included in the loss amount as well as the forfeiture and -- or,
 4    excuse me, not the forfeiture, but the restitution amount
 5    as well.  So it -- you know, it's admitted to in the statement
 6    of facts.  The pretrial conduct that resulted in his revocation
 7    and then him absconding and not -- and failing to report, that's
 8    the two-level obstruction, but it is also included -- although
 9    it doesn't affect the guidelines, it is included in the ultimate
10    loss figure.
11              THE COURT:  Ms. Oyer, do you want to be heard?
12              MS. OYER:  Your Honor, yes.
13              THE COURT:  Would you take your mask down, please.
14              MS. OYER:  Yes, Your Honor.  I'd like to note that the
15    plea agreement does include factual statements -- those are on
16    Page 13 of the plea agreement -- in which Mr. Carter admits to
17    the conduct that he engaged in while on pretrial release.
18              THE COURT:  Well, let me go to that, because that's
19    exactly the kind of thing that I need to see.  Give me the
20    reference again.
21              MS. OYER:  It's -- in the plea agreement, it's on
22    Page 13.  It's the middle paragraph of the page.
23              THE COURT:  Okay.
24              MS. OYER:  And at the end of that paragraph it notes
25    that that adds $11,854 to the loss calculation in the plea.
```

```
1              THE COURT:  Understood, okay.  Well, that's a fair
2  statement.
3              MS. OYER:  And additionally, Your Honor, I want to
4  note that before Mr. Carter violated his supervised release with
5  this conduct, he had signed another plea agreement that he was
6  expected to enter.  The plea agreement that the Court is
7  considering now has become substantially less favorable than the
8  plea offer that was on the table previously.  That plea offer
9  was a C plea to a sentencing range that was below the
10 guidelines.  That plea offer, understandably, was withdrawn
11 after -- even though it was signed.
12             THE COURT:  Who did you negotiate that with?
13             MS. OYER:  Your Honor, that was not me or Ms. Hayes, I
14 don't think.  That was -- Mr. Citaramanis represented Mr. Carter
15 previously and negotiated that plea agreement with, I believe,
16 another AUSA who preceded Ms. Hayes in this case.
17             THE COURT:  Who was the U.S. Attorney, Ms. Hayes?
18             MS. HAYES:  That was Assistant U.S. Attorney
19 Greg Bernstein.
20             THE COURT:  From --
21             MS. HAYES:  It was Greg Bernstein.
22             THE COURT:  Okay.
23             MS. OYER:  So it's our position in light of that, that
24 the consequences of Mr. Carter's violation of pretrial release
25 have already been significant and are reflected in the new
```

1   plea agreement which the Court is considering here.

2          THE COURT:  Understood.  No, I think that's a fair

3   explanation, then.

4          All right.  Well, then, that would take us to the --

5   back to the statement of reasons, where -- I don't know whether

6   Probation wants to be heard any further on this.

7          MR. LOWE:  No, Your Honor.

8          THE COURT:  All right.  Well, I think, then, that

9   would take us to a total offense level of 20.  Is that what's

10  agreed to?  Government, defendant, is that correct?

11         MS. HAYES:  I'm sorry, I couldn't understand what --

12         THE COURT:  On Count One, total offense level of 20 --

13         MS. HAYES:  Yes, Your Honor.

14         THE COURT:  Criminal History Category IV, are we --

15         MS. HAYES:  Correct.

16         THE COURT:  Are we agreed, yes or no?

17         MS. HAYES:  Yes, Your Honor.

18         MS. OYER:  Yes, Your Honor.

19         THE COURT:  All right.  So that ...

20         MS. HAYES:  And Your Honor, I note that that would be

21  as to Count One, followed by the consecutive two years for Count

22  Two.

23         THE COURT:  So a criminal history category of 20 --

24  sorry.  A criminal history category for offense level 20 would

25  give us 51 to 63 months, and then the supervised release range,

```
1    back to the presentence report on that, is one to five years on

2    Count One, and one year as to Count Two.  The fine range, then,

3    as to Count One is 20,000 to a million dollars.  And as to Count

4    Two, two hundred -- subject -- I gather -- is there -- is that

5    the total guideline range for both counts, like -- I gather,

6    20,000 to a million?  All right.  Very good.

7              All right.  I'll hear the government on allocution.

8              MS. HAYES:  Thank you, Your Honor.  As set forth in

9    the government's sentencing memorandum, the government believes

10   that a total sentence of 87 months in prison is appropriate

11   under the facts and circumstances of this case in considering

12   all of the 2250 -- or excuse me -- 3553(a) factors.  That would

13   be comprised of 63 months as to Count One, which is the top of

14   the guidelines, followed by the mandatory consecutive two years

15   as to Count Two.

16      The government also requests that the Court impose a term

17   of supervised release of five years, and that the defendant also

18   be ordered to pay restitution as agreed in the plea agreement in

19   the amount of $131,588.24, and then forfeiture in the amount of

20   $119,733.94 --

21             THE COURT:  Let me go back there and make sure I

22   understand the difference.  The restitution amount again?

23             MS. HAYES:  Is $131,588.24.

24             THE COURT:  All right.  Payable to just a number of

25   the credit unions and such?
```

1    MS. HAYES:  Correct, Your Honor, and as well as the

2  property managers of a variety of buildings that were also

3  defrauded by Mr. Carter's conduct.  And that number, Your Honor,

4  also reflects the approximately $11,000 loss to the property

5  management company as a result of Mr. Carter's conduct while on

6  pretrial release that ultimately --

7    THE COURT:  Actually, with regard to forfeiture, there

8  was a -- wasn't there a preliminary order forfeiture entered in

9  the case?

10    MS. HAYES:  There was, Your Honor, and that's

11  reflected at ECF 63, and the forfeiture amount is the

12  119,733.94.

13    THE COURT:  All right.  So there's no further --

14  there's no final order, then, that needs to be signed; is that

15  correct?

16    MS. HAYES:  Not at this point, Your Honor.  I believe

17  notice and publication has to go out, and then our forfeiture

18  folks will finalize that at the appropriate time.

19    THE COURT:  Do you agree, Ms. Oyer?

20    MS. OYER:  Yes, Your Honor.

21    MS. HAYES:  Your Honor, we believe that a top of the

22  guidelines followed by the two years mandatory is appropriate

23  under all the facts of this case, including, as we've already

24  previously discussed, Mr. Carter's conduct while on pretrial

25  release that ultimately resulted in his revocation.

1         He was ordered to be -- to present himself to the U.S

2  Marshals Service following his order of detention, which he did

3  not do.   Instead, he went and fled to Florida, changed his phone

4  number, fled to Florida, where approximately two weeks later, he

5  was apprehended in the State of Florida and ultimately was

6  detained since then.

7         But starting with the conduct underlying his current

8  indictment, the conduct that was involved in the indictment

9  occurred between January of 2015 and December of 2017, and

10  during that time period, Mr. Carter defrauded primarily

11  financial institutions, as well as property management

12  companies, of over $100,000 as a result of a variety of schemes.

13         He also victimized, meaning he stole victim infor- --

14  or personal identifying information from a variety of victims,

15  including victims that he had access to during -- by the

16  position of his employment as a supervisor at a security

17  company.

18         He would take the victim PII, and then he would open a

19  variety of bank accounts using the victim's PII.  He then would

20  deposit nonsufficient funds, so checks that were not supported

21  by sufficient funds, from the issuing bank of the check, and

22  prior to the bank determining that, would have withdrawn

23  significant sums of money, ultimately creating a loss to the

24  financial institution.

25       He also opened up credit cards and other accounts in the

 1   name of his victims, whose personal information he had been

 2   using, and then would use those credit cards on personal

 3   expenditures, ultimately failing to pay off the debt.

 4       He also victimized the property management company using

 5   various methods.  In one instance, for example, he used his

 6   legitimate identifiers to obtain an apartment lease but

 7   thereafter did not pay his rent.  Instead, he tried to do

 8   deposits from the nonsufficient fund -- check fund scheme to pay

 9   off the rent that ultimately bounced, and the rent wasn't paid.

10       At another residence, he used a victim's personal

11   identifying information without that victim's knowledge and

12   obtained an apartment lease, ultimately did not pay his rent at

13   the apartment complex, and that resulted in a loss to the

14   property.

15       That's particularly compelling, because he did the same

16   exact thing while on pretrial release.  So given the benefit of

17   being out in the community, he used, actually at that point, the

18   victim -- the Social Security number of his son, the son that he

19   states has suffered from kidney disease, which the government

20   does not contest at all that his son does in fact face serious

21   medical issues, but he used that son's Social Security number,

22   rented an apartment complex, failed to pay rent.  He also used

23   the payroll, fake pay stubs, fake letters from a purported

24   employer in order to support his application for that apartment

25   lease.

1          THE COURT:  You're not listening, Mr. Carter.

2   Mr. Carter, I know you're talking to your lawyer, and I'd rather

3   have you pay attention to the prosecutor, because you're in

4   serious trouble, and your life is also in serious trouble.  So

5   you need to hear what's being said now, and you certainly are

6   going to need to hear what I say.

7          If you need time to talk to Ms. Oyer, I'm going to

8   stop the proceedings right now and you ask your question.  But

9   don't act as if this is just another day in Court; it is not.

10  Your future will be determined in the next several minutes.

11         Are you with me?

12         THE DEFENDANT:  I'm with you.

13         THE COURT:  All right.  You need to talk to her now?

14         THE DEFENDANT:  Yes, I do.

15         THE COURT:  Go ahead.  We'll hold up.

16     (The defendant and Ms. Oyer consulted.)

17         THE COURT:  Are you ready?

18         MS. OYER:  Yes.  Thank you, Your Honor.

19         THE COURT:  All right.  Go ahead, Ms. Hayes.

20         MS. HAYES:  Thank you, Your Honor.

21         The -- so the conduct was rampant.  It was over the

22  course of many years, and then even once given the benefit of

23  being released into the community after being released from his

24  prison sentence out of the Eastern District of Virginia, he went

25  right back to his old ways.

14

1      He had a pretrial services approved residence, where

2  he was supposed to be residing, but instead, he used the Social

3  Security number of another individual and fake employment

4  verification and payroll in order get another apartment for an

5  unknown reason, and ultimately failed to pay rent on that

6  apartment as well.

7      And the fraud was uncovered when the property manager

8  thereafter asked the purported employer of Mr. Carter whether or

9  not he was, in fact, employed, and thereafter reported the

10 fraud, and as a result, Mr. -- the government moved to revoke

11 Mr. Carter's pretrial release, which was ultimately after a

12 virtual hearing that Mr. Carter was present.  Judge Simms

13 revoked his release and ordered that he be -- report by 3 p.m.

14 on -- to the United -- the Marshals Service.  He didn't report,

15 as expected; instead, he changed his phone number and ultimately

16 was apprehended approximately two weeks later in Florida.

17      But your Honor, this is not the defendant's first

18 brush with the law, and in fact, this is not his first time

19 using these types of schemes, not only defrauding financial

20 institutions but using victims' information that could

21 potentially impact their debts, and their credits, and, in many

22 cases, family members, as well as strangers, or colleagues,

23 or emp- -- or people applying to employ at -- to be employed at

24 the position where he was a supervisor.

25      So his criminal history dates back to at least 2006,

1    when he was charged by the U.S. military with desertion, and

2    impersonating a recruiter, and taking U.S. mail.  Ultimately, he

3    was charged federally with aggravated identity theft in 2006 and

4    sentenced to 20 months in military prison.

5         Then, in 2008, he was charged in the Eastern District

6    of Virginia with aggravated identity theft, bank fraud, mail

7    fraud, and wire fraud, and similar to this case, Your Honor, he

8    used, in the Eastern District of Virginia, victims' personal

9    information to open credit cards and then conducted withdrawals

10   and ATM transactions using those cards.

11        In that case, the defendant obtained some of the

12   victim identification information while he was incarcerated at

13   the military prison on his 20-month sentence related to

14   that aggravated identity theft.  And that, again, was pursuant

15   to his job at a prison, where he had access to a roster that

16   contained names, dates of birth, and Social Security numbers.

17        Ultimately, he was sentenced in the Eastern District

18   of Virginia to 36 months in prison but was later found to have

19   violated the terms of his supervised release and sentenced to an

20   additional three months.

21        Then, in 2010, just two years later, the defendant was

22   charged in state court in Alexandria, Virginia for felony

23   forgery, and in Arlington, Virginia for conspiracy to commit a

24   felony and four counts of felony forgery and uttering.

25        Once again, similar to the conduct currently before

1    this Court, he deposited fraudulent checks and withdrew the

2    funds before the fraudulent nature of the checks were detected.

3    He pled guilty to those charges, Your Honor, in 2013, but for

4    unknown reasons to the government, he wasn't sentenced until

5    June of 2019.

6            And that, Your Honor, was the sentence which was six

7    years, with four years and six months suspended, that he was

8    serving when he was indicted and had his initial appearance here

9    in the District of Maryland.  And he completed that sentence and

10   rolled over to federal custody on this indictment when he was

11   ultimately released on pretrial services in the middle of the

12   COVID-19 pandemic in 2020.

13           His probation in Virginia is expected to expire in

14   June of 2026.  So notably, when Mr. Carter conducted the fraud

15   on the building where -- while he was on pretrial release out of

16   the District of Maryland, he was also on probation out of the

17   state of Virginia.

18           So, Your Honor, the government thinks that based on

19   all of the 3553(a) factors, there is a significant need to

20   reflect the seriousness of the offense, to promote respect for

21   the law, and to provide just punishment, and that a top of the

22   guidelines, especially after the three levels for acceptance of

23   responsibility, is appropriate to reflect all of those.

24           Your Honor, I also think, in this particular case

25   especially, there's a significant need to protect the public and

1   to provide deterrence to Mr. Carter.  Mr. Carter has shown that

2   when he is in the community, he is defrauding individuals.  He

3   is defrauding them by using their victim PII, he is defrauding

4   financial institutions, and he simply has not -- despite being

5   employed, in many occasions, he's used that term of employment

6   to victimize other people and to get access to victim PII.  He

7   simply, when he is in the community, he is committing fraud, and

8   he has been doing that since 2006.

9           So we think, to protect the public from Mr. Carter's

10  victimization, and the financial institutions, and to afford

11  adequate deterrence to hopefully deter Mr. Carter from

12  continuing to lead a criminal lifestyle upon his release, that

13  87 months is sufficient but not greater than necessary under

14  those factors.

15          Your Honor, I also have set forth a restitution and

16  forfeiture that sets forth the restitution owed to each of the

17  victims, which are primarily, in terms of loss amount, the

18  financial institution and the property management.

19          THE COURT:  Is that in your sentencing memorandum?

20          MS. HAYES:  Yes, Your Honor.  The chart of the loss is

21  on Page 12 of my sentencing memorandum, and I also provided

22  Ms. Derro a separate chart that also included the victim contact

23  information for the Clerk's Office.

24          THE COURT:  All right.

25          MS. HAYES:  And your Honor, just to note, the

1  difference between the forfeiture amount, which is the 119,000

2  figure, and the restitution amount, which is the 131,000 figure,

3  is that the restitution includes the approximately $11,000 loss

4  to the property management company as a result of Mr. Carter's

5  pretrial services -- pretrial release violation conduct, which

6  is not subject to the forfeiture order because it's not, as

7  Your Honor noted, a count of conviction.

8        And that's the discrepancy, although ultimately,

9  certainly, the government will attempt -- you know, to any -- to

10  the extent any funds are recovered, will attempt to ask the

11  Department of Justice to take any forfeited funds and apply it

12  first to the restitution so that our victims can be as -- made

13  as whole as possible.

14        And so your Honor, unless there's any additional

15  questions for me, I reiterate again that we believe that a total

16  sentence of 87 months in prison is appropriate in this case.

17        THE COURT:  All right.

18        Ms. Oyer.

19        MS. OYER:  Thank you, Your Honor.

20        Ms. Hayes paints a picture of a long pattern of fraud

21  conduct that is stripped away from the background against which

22  Mr. Carter acted, and I want to ask the Court to take into

23  consideration in sentencing the reasons that Mr. Carter did what

24  he did.

25        He is an individual who has strived to create a family

1  life for himself, who has been gainfully employed in various

2  jobs, but who lacks the support network, financially, of a

3  family who can help him in times of crisis.  And all of

4  Mr. Carter's fraud conduct has been motivated by extreme

5  financial pressures that he has been under.

6          He has been struggling to provide for the basic needs

7  of his family throughout his adult life, single-handedly to

8  provide for his four children with two different mothers and all

9  of their various needs.  And as the Court knows from our

10  sentencing memo, one of Mr. Carter's children, his oldest son,

11  has very serious health problems that have complicated the

12  family life in general, as well as the finances of the family.

13  A younger daughter of his also has serious health issues that

14  have consumed additional resources of the family.

15          Mr. Carter has never been in a situation where he's

16  been substituting fraud for work.  He has always worked a

17  legitimate, gainful job, and at many times in his life, he has

18  worked multiple jobs at a time.  He has resorted to fraud to

19  supplement his income when his jobs were not enough to meet the

20  needs of his families.

21          But I want to note, Your Honor, that this is not a

22  case, in contrast to many fraud cases the Court sees, in which

23  Mr. Carter committed fraud in order to live a lavish or

24  extravagant lifestyle.  He was not taking vacations, he was not

25  buying cars, he didn't own a home, he wasn't buying expensive

1    clothes or shoes or jewelry for himself or others.

2            He, in contrast to many fraud defendants, was trying

3    his hardest to support his family.  He did it in -- at many

4    points in time, in a way that was not the right way and that has

5    gotten him into trouble, but his intentions have never been

6    greed or malice; it has always been to care for the needs of his

7    family.

8            I want to note, Your Honor, that, as I'm sure the

9    Court is aware from our sentencing memo, Mr. Carter himself

10   never had a positive paternal figure in his life, and he has

11   tried, as an adult, to do better by his own children than what

12   was done for him during his youth.  And he's made some bad

13   decisions along the way, but every one of those bad decisions

14   was motivated by a desire to be there for his family and to

15   support his children.

16           And I want to emphasize, Your Honor, that by all

17   accounts, Mr. Carter is truly a great father.  The -- we

18   interviewed -- Ms. Claire Benack, who's present in the courtroom

19   from the Office of the Federal Public Defender, interviewed a

20   number of people who know Mr. Carter in preparation for this

21   sentencing.  One of them was Julia Tuvin, a social worker who

22   cares -- who's part of the care time for Ricardo III,

23   Mr. Carter's son, who has severe advanced stage kidney disease.

24   And Ms. Tuvin confirmed that Mr. Carter has played an

25   instrumental role in his young son's care, which is complicated,

1    and time-consuming, and intensive.  He's been a supportive and

2    devoted father at every step of the way.  And that was made very

3    clear in the interview with Ms. Tuvin.

4           I want to note also that Ms. Nakeda Washington, who is

5    the mother of Mr. Carter's three younger children, has described

6    him in an interview as a devoted, hands-on father who would do

7    anything to care for his children and make them happy, and who

8    goes out of his way to plan special activities for them, trips

9    around the city for them that meet their interests; he's just

10   really a dedicated father who prioritizes his children above all

11   else.

12          All he does, Your Honor, is work and care for his

13   children.  He doesn't have -- he doesn't have personal leisure

14   time, he doesn't travel, he doesn't gamble; he is a devoted and

15   hands-on family man.

16          Now, as it's noted in the presentence report,

17   Mr. Carter has long suffered from stress and anxiety disorders

18   that appear to be related to the tremendous amount of weight

19   that is put on him to meet his family obligations.  As a result,

20   Mr. Carter has made some decisions that have been impulsive and

21   have ultimately undercut all of his positive efforts, and he

22   recognizes that he very much needs treatment for his mental

23   health issues.

24          He has -- he sought out treatment while he was on

25   pretrial release and was diagnosed with generalized anxiety

1    disorder and depression, and was receiving medications, and was

2    attending counseling.  However, since he has been incarcerated

3    at CDF, he has made repeated requests for mental health

4    services, which have not been met by the jail.  He's not been

5    able to receive any counseling, he's not been on medications for

6    his mental health issues, although he very much wants to be, and

7    he's motivated to receive treatment when he returns to the

8    community, as well as during his term of incarceration in the

9    Bureau of Prisons.

10           And I want to address, Your Honor, the situation on

11   Mr. Carter's pretrial release.  Obviously, the decision not to

12   turn himself in, the decision to go to Florida, was a very

13   significant and substantial mistake that has put Mr. Carter in a

14   much worse situation than he was in before, and he deeply

15   regrets that.  The reason that he acted in that way was simply,

16   Your Honor, that he panicked.

17           I've noted in my sentencing memo that right around the

18   time that Mr. Carter was ordered to turn himself in, that his

19   bail was revoked, he -- his son had been advised, or he had been

20   advised that his son needed to have a kidney transplant.

21   Mr. Carter was undergoing procedures to be evaluated as a

22   potential kidney donor for his son, and the family was closely

23   coordinating with transplant services so that Mr. Carter's

24   15-year-old son, who was then 14, could receive a kidney

25   transplant.

1      This was obviously a very scary and very stressful

2  time for Mr. Carter and for his entire family, and he was

3  feeling a tremendous burden of obligation during that time to be

4  there and try to make everything all right.

5      I've personally reviewed those records, indicating

6  that Mr. Carter was at every single appointment with his son,

7  and it's a lot of appointments on a regular basis, and that he

8  was doing everything he could to make sure that his son got the

9  best possible care.

10     And your Honor, he panicked when he was ordered to

11  self-surrender and thought of the prospect of not being there to

12  be able to be the kidney donor, or not being there to coordinate

13  his son's medical care, and he made a very deeply regrettable

14  decision, but it was a decision, again, that was motivated not

15  out of malice or greed; it was motivated out of a desire to

16  protect his family.

17     And your Honor, Mr. Carter's mother is present in

18  court today, and Ms. Derro, I know, provided the Court with a

19  letter that she wrote to the Court.  She also provided me with

20  some photos -- I'd like to just put them on the ELMO briefly --

21  which show Mr. Carter with his children.

22          MS. OYER:  Here's one, Your Honor.

23          THE COURT:  I see it.

24          MS. OYER:  Here's Mr. Carter's older son here are two

25  of Mr. Carter's younger children, and finally, a photo of

1    Mr. Carter with his mother, who's in the courtroom today.

2         Your Honor, the final thing that I want to note is

3    that Mr. Carter has been incarcerated during an incredibly

4    difficult time.  He's been incarcerated the last seven months

5    during the COVID-19 pandemic, and the conditions at CDF have

6    been dismal, at best, during this time.  As noted in my

7    sentencing memo, many judges of this court have noted that that

8    is a basis for a downward variance during this COVID-19

9    pandemic, and the Fourth Circuit has approved that as a basis

10   for a downward variance as well.

11        Your Honor, I want to ask the Court to give Mr. Carter

12   the opportunity to return to his family as soon as possible so

13   that he can be there for his son, with his health issues, who

14   needs him, for his younger children, who are very attached to

15   him and who miss him greatly, as noted in my sentencing memo,

16   and I would ask the Court to consider imposing the longest

17   possible term of supervised release rather than the longest term

18   of incarceration in order to hold Mr. Carter accountable but

19   allow him to return to the community so that he can be there for

20   his family.

21        THE COURT:  Well, I haven't heard you address, and

22   perhaps Mr. Carter will, why he's not going to go back and do

23   what he seems to do all the time when he's out there.  You say

24   he's sorry he made a mistake and he's beholden to his family,

25   but isn't there some concern about the community?  How about the

1    lives that are affected, the hundreds of lives that are affected

2    by what he did, and the fact that he gives every indication that

3    he's going to do it again?

4            What do you say to that?  Why should a judge now, a

5    judge back in line Here, after he's appeared before other judges

6    over a long period of time, believe that he's not going to

7    revert to his old ways?

8            MS. OYER:  Well, Your Honor, a couple of things on

9    that point.  One is that Mr. Carter needs mental health

10   treatment, which will help him to behave in a way that's less

11   impulsive.  His actions are not thought through or planned; like

12   failing to turn himself in, that was an impulsive decision made

13   on emotion, and he needs mental health treatment, and he

14   recognizes that.

15           Two, Your Honor, I want to note that this period of

16   separation from -- Mr. Carter from his family, the last seven

17   months while he's been in pretrial detention, has been the most

18   difficult separation from them that he has ever endured, and he

19   is struggling on a daily basis, hanging by a thread, to mentally

20   process the fact that he has let his family down at such a

21   critical time, especially at a time when his oldest son needs

22   him the most to be there as a possible kidney donor for him.

23           And Mr. Carter has -- is really -- he is suffering,

24   Your Honor, I can attest to that, based on my meetings with him.

25   He's really feeling the weight of his mistakes in a way that he

1    did not in his younger years.

2            If Mr. Carter is placed on supervised release, he will

3    be accountable to this Court, to Your Honor, for any mistake

4    that he makes, and he does not expect that the Court will show

5    him any leniency if he violates the supervised release down the

6    road, but your Honor, I would ask the Court to consider his

7    personal circumstances and impose a longer term of supervised

8    release rather than a longer term of imprisonment as a way of

9    addressing this conduct.

10           THE COURT:  All right.  Mr. Carter, you have a chance

11   to address the Court at this time.

12           THE DEFENDANT:  Your Honor, first of all, you know,

13   I'm -- in a way, I'm glad that I'm here today, put all this

14   behind me.  I've let a lot of people down, let my family down,

15   let my kids down.  But I don't have to look over my shoulder no

16   more, I don't have to feel like I gotta do the things I was

17   doing to get by.

18           Being away over the last eight months, it changed my

19   life.  Claire asked me -- Ms. Oyer asked me, you know, what did

20   I want to say.  I said I didn't want to prewrite anything, I

21   didn't want them to help me with anything; I wanted to look you

22   face-to-face, I wanted to look Ms. Hayes face-to-face, look my

23   lawyer face-to-face.

24           I am sincerely sorry for my actions, sincerely sorry.

25   It's been going on for years.  I'm not going to sit here and

1    blame nobody, I don't want to continue to blame nobody; I gotta

2    look at me.

3           So today, I know what I've done.  And I know what I've

4    done.  Those charges don't reflect who I am.  I've been

5    struggling for years, trying to get by, trying to do better.

6    All I want to do is do better.  I know I'll have to do some

7    time, and incarceration is expected.  I need help, I need help.

8    I need resources.  Incarceration and all is not going to do it.

9    I don't want to be put in a position to make these same mistakes

10   again.

11          So as a man for my children, for myself, I really want

12   the help.  I want the help.  I need the resources when I get

13   back out here.  And the same things I was doing with bad energy,

14   and in -- things -- doing things negative, I want to do them the

15   right way.  I learned a lot, you know, just looking at what

16   people are going through over this pandemic.  My mother is

17   sitting here today.  Things that weren't mentioned, during this

18   pandemic, during the time of my arrest, when I lost my

19   grandmother during the pandemic.  My mother is sitting here

20   today.  While I was in incarcerated, two of my cousins were

21   murdered.  I had another cousin shot in the face, and their

22   one-month-old son, you know, who was left to be burnt alive.  So

23   my family going through a lot.

24          I panicked when it was time to turn myself in.  I

25   panicked.  I wanted to be there for them.  I wanted to be there

1   for my son.  I have my kids at home.  I just didn't know what to

2   do.  But like I said, I don't want to sit here and -- and

3   continue to make excuses.  I just want to do better.

4          So I'm sincerely just asking the Court to take all

5   that into effect.  I -- I know what I've done was wrong.  I

6   don't want to continue to live like this; I'm tired.  I'm tired

7   of it.  I just want to go out there and be productive for my

8   family and be productive, you know, all around.

9          I was doing a lot, you know.  Everybody bringing up

10  the negative for pre-trial but, you know, nobody bringing up the

11  positive that I was doing.  I was working.  Like my mom could

12  tell you, in and out the hospitals, I was working so much.  I

13  was working for Goodwill, then I was working at night.  I've had

14  recognition from the CEO of Goodwill's.  I've been on the news.

15  It's a lot of stuff that -- you know, a lot of things that

16  weren't bringing up.

17         My decisions were impulsive, not the best decisions at

18  all, but I don't want to live like that no more.  Like I said, I

19  see how people affected by the pandemic.  I look at the news and

20  see all the fraud and all the stuff going on, and I don't want

21  to be that guy tied into that type of stuff anymore.

22         I see how it's affecting people, I see how people are

23  having trouble getting things done, and it's actually been done

24  to me as well.  So a lot of the things that, you know, were

25  being talked about today, it's not all me.  A lot of it's

1   twisted up, but I have to take responsibility for what I've

2   done.  I've been a victim of a lot of this stuff because of my

3   father, who was the cause of most of this stuff, and a lot of

4   that's been tied into things as well.

5          But with all that being said, I just want to get this

6   over with.  I want to go in the BOP, make the best out of the

7   BOP, take advantage of any programs I can get.  I think all of

8   that would be helpful for me.  I've got to find out ways to deal

9   with the stress, I've got to find better ways to deal with the

10  stress, because you know, a lot of this stuff has just been

11  overwhelming.  It's been overwhelming to deal with, you know,

12  it's been overwhelming to not be there for my kids, not be there

13  for my family, and I know they look upon me, and I know they

14  need me.

15          My younger kids, they getting ready to get --

16          THE COURT:  I need for you to wind up; you're

17  repeating yourself now.  I need you to --

18          THE DEFENDANT:  All right.  Well, I -- that's --

19  that's just pretty much it; I just want the help and the

20  resources, Your Honor, to do better.

21      (Conference at the Bench.)

22      It is the policy of this Court that every guilty plea and

23  sentencing proceeding include a bench conference concerning

24  whether the defendant is or is not cooperating.

25      (Open court.)

1          THE COURT:  Well, let me say something to you and your

2    family, and particularly to your mother, as to -- who has

3    expressed surprise in her letter to me that you got into

4    trouble.  That I have some real skepticism about, but I'll come

5    back to that.

6          Now, first of all, I'm sure you've heard about

7    Sentencing Guidelines in the past, and I know we talked about

8    them when you pled in this case.  But there's always been a

9    concern that people who are similarly situated get treated in

10   similar fashion, so that somebody in one part of the country or

11   even in the same court before another judge doesn't get a much

12   harsher sentence than somebody else.

13         And that's why we have Sentencing Guidelines.  I mean,

14   they're composed by lawyers and judges and other people who rate

15   different kinds of crimes, and then they evaluate offenders

16   based on their criminal history, and the Court comes up with a

17   table which recommends what the appropriate custody time should

18   be for someone, plus supervised release and so on.

19         And in your case, when -- before I even really get my

20   hands on the case, we get Sentencing Guidelines that are

21   recommending that with regard to Count One, you get somewhere

22   between 51 and 63 months, and Count Two is a mandatory

23   consecutive 24 months.  And I don't have anything to do with

24   that, but that's the way, objectively speaking, or as objective

25   as one can be in this case, we look at someone like you.  You're

1  right there in the category, not as somebody who's entitled, for

2  any particular reason, to special tenderness, or solicitude, or

3  leniency, but that's the way you are profiled for people who are

4  similarly situated.

5          There are a number of statutory factors the Court

6  looks at, is required to look at when one imposes a sentence,

7  and I'm going to reverse the order slightly on this because I

8  want to talk first about your nature and characteristics, and

9  then I'm going to talk about the seriousness of the offenses

10 that you've pled to.

11         It appears -- first of all, you're not a young man,

12 you're 38 by my calculations, so it's not like you're just

13 discovering a new world.  I hold you accountable for that.

14 There may be mental health issues, and we'll address those,

15 certainly, to the extent we can while you're in custody and

16 while you're on supervised release.  There's nothing I can do

17 about your mental health issues right now.

18         Certainly, to the extent that you say you have mental

19 health issues and I should give you less time, that doesn't cut

20 any ice with me, not going to happen.  That's not a factor that

21 I consider when I impose my sentence.  It may be when I impose

22 the conditions of supervised release and while you're in

23 custody.  So let's put that to the side.

24         I gather that you're concerned about your family,

25 because mostly that's what you've talked about.  You're

1   concerned about your children, you're concerned about your one

2   son with kidney problems, and you say that you are very much

3   stressed by the fact that they are not here and you've not been

4   with them for seven months and so on and so forth, and I believe

5   all that.

6           I speak for the community.  I want to talk about the

7   hundreds of people, the dozens of institutions that you have

8   victimized, over several years, by assuming false identities, by

9   affecting their credit situations.  Who worries about them?  I

10  haven't heard you say anything about that.  In fact, I didn't

11  hear your counsel say anything either about what about all these

12  people who were victimized by you?  Is your difficult childhood

13  a justification for going out and ruining lives?  Of course it

14  isn't.  And your mother needs to hear that, and you need to hear

15  that.

16          The mere fact that you want to be with your son, that

17  you have four children and so on, in no way has any connection

18  with the fact that you have not gone and stolen a loaf of bread

19  to feed them, you've gone out with these rather sophisticated

20  check kiting schemes, identity theft schemes, dozen and dozens

21  of times, since you were a young man, and you're here to tell me

22  in effect, treat me gently, Judge, because I've got stress at

23  home.  It doesn't connect with me.  I want you to understand

24  that.

25          So while you may have concern about your family -- and

1    I'm surprised if your mother says she wasn't aware of this, and

2    if she wasn't, frankly, it's important that she become very

3    aware of what you do in the future, because your liberty is

4    going to depend on that.  But your concern for your family, your

5    concern for your son, in no way justifies the kind of crimes

6    that you've committed, again and again and again, to the tens of

7    thousands of dollars.  So let's be very clear about you and your

8    circumstances.

9         But then let's look at the nature and circumstances of

10   the offenses as a separate element, which frankly is the first

11   element I'm supposed to consider under the statutory penalties.

12   And you've gone out and stolen at least $130,000-plus by what

13   you've done, by affecting multiple credit unions, multiple

14   individual identities, taking advantage of people who came to

15   work for your company, as I understand it.  Using your son as a

16   weapon to try and get some sort of unfair advantage.

17        I mean, those are just things that are unacceptable.

18   The community won't stand for it, and they won't say, let's be

19   compassionate for Ricardo Carter, because his son is ill, let's

20   understand that maybe he won't commit these crimes while he's

21   out there, and maybe he's done it again and again and again over

22   many years, but let's forgive, let's forget.  We don't.  I

23   don't.  I speak for the community, I speak for history.

24        And if I listen to your attorney, who does a good job

25   making the case, it makes you sound like a victim.  You're not a

1   victim; you're a perpetrator.  I want -- history is written

2   right now, and I'm telling you that.  I reject the proposition

3   that you've been victimized in any way; you are a perpetrator of

4   crime, and you have victimized many people.

5        And maybe in the course of your mental health

6   treatment, you will begin to see that, because if you don't, if

7   you continue to see yourself as someone under stress and

8   victimized, Lord knows where you go.  And candidly, I can't be

9   convinced today that you aren't going to go right back to doing

10  what you've done all along, because this goes back into your

11  20s, and here you are in your late 30s.  I mean, I know --

12  to say you're -- that you take responsibility, and Judge, I'm

13  sorry, of course you are; you face some serious jail time.

14       Right now, the guidelines have been very generous to

15  you, in my mind, but I mean, I'm just astounded by the fact that

16  you went out, you were released, and you did the same sort of

17  funny business that you were being convicted of.  Very

18  troublesome.

19       So -- but hey, history is written here, and I'm

20  telling you now how I begin to write the first draft.  Right

21  now, it's not looking good for you in terms of where you are at

22  this moment, and your future, frankly, is uncertain.  If you're

23  back before me or another judge, rest assured that much of the

24  rest of your life will be in custody.

25       Reality.  Time to face that.  You've faced other

1    judges in the past, so I'm confident that you told them that you

2    saw the light and you were going to go straight, so to speak.

3    Didn't happen, don't know whether it will happen with you now.

4    That's the tragedy of being 38 and having time and again

5    committed the offenses that you committed.  And then one has to

6    say, I don't know about this fellow; he's very likely to out and

7    do it all over again.

8        And that's where I am right now, with that in mind.  So to

9    the extent that we want to deter others from doing what you do,

10   check kiting, identity theft, of course we need to be

11   substantial in our sentence; need to deter you, because I don't

12   know what you're going to do in the future.  You may well jump

13   back to where you've been.

14       If there's any sort of medical attention that you need

15   along the way, including mental health counseling, certainly,

16   I'll provide for that, but it doesn't justify what you've done.

17   This was not a one-off offense; this was a multiple series of

18   offenses over a long period of time, with a lot of victims who

19   were seriously affected by it.  And although I didn't hear you

20   mention them once, I'm telling you right now, to me, they're

21   more important than you are.  I take your personal situation

22   into account, but I speak for the community, and you need to

23   understand that.

24       So what I am going to do is sentence you on Count One to

25   63 months in custody, and Count Two, 24 months consecutive to

1    that, a total of 87 months.  I'll give you credit for time

2    served, so that's since April of this year, whatever that might

3    be.

4         And then I'll put you on supervised release for a period of

5    five years under Count One, and I think it's one year

6    consecutive under -- sorry -- concurrent under Count Two.

7    During the course of your supervised release, you will abide by

8    certain standard conditions and special conditions, which I'm

9    going to recite for you now.

10        The -- and as I say, this sentence, I think, at the high

11   end of the guidelines, is appropriate in your case.  There are

12   certain mandatory conditions that will be applied to you.  You

13   must not commit any crime, federal, state or local, when you're

14   on supervised release.  You know, that means if you go and did

15   the kind thing you did on supervised release, you're back here,

16   you're in violation of your supervised release, you're back in

17   jail; that's what's going to happen.  That's a condition of your

18   supervised release.

19        You must not unlawfully possess a controlled substance, you

20   must refrain from any unlawful use of a controlled substance,

21   and if there are any drug tests to be held, you are to submit to

22   them.

23        You must make restitution, which I will mention

24   momentarily, as set forth in 18 U.S.C. Section 3663 and 3663(a),

25   and any other appropriate authorized statute.

1          You must cooperate with the collection of DNA, as directed

2     by your probation officer.

3          There are certain standard conditions of supervised release

4     that apply in addition to the mandatory conditions.  You have to

5     report to your probation office in this federal district within

6     72 hours of your release from prison, unless the probation

7     officer tells you otherwise.  And after you receive -- after you

8     report to the office, you will receive instructions from your

9     probation officer about how to comply and report thereafter.

10          You must not knowingly leave the district, that is, this

11    District of Maryland, unless you're authorized to do so.  You

12    fled to Florida.  Don't do it again; that's another reason to

13    revoke your supervised release.  I want to be very clear with

14    you about what this means.

15          All these conditions, by the way -- and I'm not through

16    with them yet, are in lieu of getting more jail time, because

17    the easy solution with some people is, just give them straight

18    jail, as much as you can give them, and not give them that

19    opportunity on the outside to kind of reenter the process.

20          So one of the conditions is you not leave the district,

21    that is, the District of Maryland, without permission.  Among

22    the further requests, you must -- directions, rather, you must

23    answer truthfully any questions that are asked to you by your

24    probation officer, you must live in a place approved by your

25    probation officer, and if there's any move contemplated, you

1    have to get the approval of the probation officer to do so.

2       You must allow your probation officer to visit you at home

3    or elsewhere and permit the probation officer to take any items

4    that might be in plain view that are inappropriate for you to

5    maintain.

6       You must try to obtain employment, unless you are otherwise

7    excused.  You must not communicate with someone that you know is

8    involved in criminal activity, and if you know someone has been

9    convicted of a felony, you may not knowingly communicate or act

10   with that person without first getting permission of your

11   probation officer.  And if you are arrested or questioned for

12   any reason by a law enforcement officer, you have to report that

13   to probation within 72 hours.

14       You're not to own, or possess, or have access to any

15   firearm, ammunition, destructive device, or dangerous weapon,

16   and any item that might cause bodily injury or death to another,

17   and you must not act as or receive any direction to act as a law

18   enforcement confidential human source or informant without first

19   getting permission of the Court.

20       And if it's determined that you pose a risk to another

21   person, the probation officer may require you to notify that

22   person about any risk that you present, and he may -- the

23   probation officer may confirm that you have -- that that person

24   has been notified of the risk.  And, of course, in general, you

25   must follow the instructions of the probation officer related to

```
1    the conditions of supervision.

2         Now, there are some special conditions of supervised

3    release, again, that you need to abide by.  First of all, there

4    is restitution to be made in the amount of is $131,588.24,

5    respectively, to the Pentagon Federal Credit Union, SunTrust

6    Bank, Andrews Federal Credit Union, Capital One Bank, Navy

7    Federal Credit Union, First Premier Bank, Aspire Apollo

8    Apartments, Tribeca Apartments, Madison Garden Apartments, and

9    Camden Largo Town Center Apartments, in the amounts that are set

10   forth on Page 12 of the government's response to the defendant's

11   sentencing memorandum, but a total of $131,588.24, payable to

12   the Clerk, who will make the appropriate distribution.

13        There is a special assessment in this case of $200 due and

14   payable at this time.  You are not to open any new credit

15   charges or additional lines of credit without approval of your

16   probation officer.  And of course, this restitution order is

17   something that you must comply with as a condition of your

18   supervised release.

19        I will direct that you participate in mental health

20   treatment and follow any rules and regulations of that program.

21   The probation officer will, in consultation with an appropriate

22   provider, supervise you as to the nature of the program,

23   location, and so on.  And I will, of course, during the period

24   of your incarceration, recommend that while in custody, you

25   receive appropriate mental health counseling.
```

1    In terms of further special conditions to supervised

2  release, not only is it that there be drug counseling, but any

3  substance abuse treatment program is something you must

4  participate in and follow their appropriate rules and

5  regulations.  And of course, you must be tested in connection

6  with that.

7    Now, I don't know, Ms. Oyer, whether there's a special

8  request that you're making as far as where the defendant might

9  be held.  I indicated that he does get credit for time served,

10  but I don't know that he would end up in Chesapeake Center.

11    MS. OYER:  Yes.  I'd ask the Court to recommend to the

12  Bureau of Prisons that Mr. Carter be designated to FCI

13  Petersburg in Virginia.

14    THE COURT:  Petersburg?  All right, I will do that.

15  And I want to say, also, while in custody, I will recommend that

16  you participate in any substance abuse program there, as well as

17  appropriate mental health evaluation and treatment.

18    Now, with regard to the sentence and the restitution,

19  as far as the payout period, I don't know that we're in a

20  position to make any specific recommendation as to what the

21  amount should be, but I think I can perhaps put in at this point

22  $100 per month, effective 30 days from release.  And we'll see

23  where we are on that as far as the payment, $100 total per

24  month.  The Court imposes no fine in this case for inability to

25  pay.

1      Apart from the notice of appeal, is there anything

2  further on the sentence, that's on the substance of the sentence

3  itself, Ms. Hayes, the Court should address?

4          MS. HAYES:  Yes, if you can just on the record also --

5  I think we chatted briefly about it, but confirm that you have

6  ordered forfeiture in the amount of $119,733.94 and incorporate

7  that into the judgment.

8          THE COURT:  The order has been signed, it is, I think,

9  the order of forfeiture.

10         MS. HAYES:  Your Honor, I believe that -- the

11  preliminary order of forfeiture, too, but the judgment also

12  needs to reflect and incorporate that order of forfeiture.

13         THE COURT:  Very well.  All right.  The Court does

14  incorporate that.  Give me the number again?

15         MS. HAYES:  One thousand -- or, sorry, $119,733.94.

16         THE COURT:  All right.  The Court will incorporate

17  that forfeiture amount as well.

18         Anything before I give the notice of the right to

19  appeal, Ms. Oyer?

20         MS. OYER:  No, Your Honor.

21         THE COURT:  All right.  Well, you have a right to

22  appeal this matter, and -- there probably was a waiver, I'm

23  gathering, there was in the plea agreement, but to the extent

24  that you think there's any appealable issue, you would have

25  14 days to notify -- to file your appeal, and Ms. Oyer can tell

1    you more about how to go about that.

2         Is there anything else from the government?

3         MS. HAYES:  Nothing for the government, Your Honor.

4         THE COURT:  Ms. Oyer?

5         MS. OYER:  No, Your Honor.

6         THE COURT:  Okay.  There were Counts One and Two of

7    the information, maybe?

8         MS. HAYES:  Yes, Your Honor.  The government will

9    dismiss any open counts, aside from Counts One and Two of the

10   indictment to which he pled.

11        THE COURT:  Fair enough.  They'll be dismissed, then.

12        Okay, Mr. Carter.  The future is in your hands, in

13   your hands.

14        All right.  Anything further?

15        Thank you.  We're adjourned.

16        THE COURTROOM DEPUTY:  This Honorable Court stands in

17   recess.

18        (Court recessed at 3:38 p.m.)

19                      *      *      *

20

21

22

23

24

25

1        CERTIFICATE OF OFFICIAL REPORTER

2        I, Patricia Klepp, Registered Merit Reporter, in and for

3    the United States District Court for the District of Maryland,

4    do hereby certify, pursuant to 28 U.S.C. § 753, that the

5    foregoing is a true and correct transcript of the

6    stenographically-reported proceedings held in the above-entitled

7    matter and the transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United States.

9                        Dated this 19th day of December, 2021.

10

11
                    _____/s/_____
12                  PATRICIA KLEPP, RMR
                    Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25